IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WILLIAM C. FLETCHER, JR.,                     )
                                              )
                          Plaintiff,          )
                                              )
            v.                                )    C.A. No. 17-669 (MN)
                                              )
CONNECTIONS CSP,                              )
                                              )
                          Defendant.          )

### **MEMORANDUM OPINION**

William C. Fletcher, Jr. – Pro Se Plaintiff.

Dana Spring Monzo, Karine Sarkisian, WHITE & WILLIAMS LLP, Wilmington, DE – Counsel for Defendant.

September 4, 2020
Wilmington, Delaware

**NOREIKA, U.S. District Judge:**

Plaintiff William C. Fletcher, Jr. ("Plaintiff" or "Fletcher"), proceeds *pro se* and has been granted leave to proceed *in forma pauperis*.   (D.I. 5).   He commenced this action on June 2, 2017.   (D.I. 3).   During the relevant time-frame Plaintiff was housed at the Howard R. Young Correctional Institution ("HRYCI").   He is currently housed at Sussex Correctional Institution ("SCI").   Fletcher alleges retaliation by Defendant Connections Community Support Systems ("Defendant" or "Connections") when it allegedly failed to provide Plaintiff mental health and medical care following grievances he submitted.   (D.I. 3 at 2, 5; D.I. 3-1 at 5-8).   Presently before the Court is Connection's motion for summary judgment as well as several motions filed by Fletcher.   (D.I. 73, D.I. 88, D.I. 95, D.I. 97, D.I. 100, D.I. 106).   Briefing is complete.

## I.    BACKGROUND

As alleged in the Complaint, Plaintiff participated in a behavior modification program run by Connections.[1]   (D.I. 3-1 at 1).   Plaintiff alleges that his Connections program counselor Oludare, approached him and asked Plaintiff to arrange a job interview at a car dealership where Plaintiff was employed prior to his incarceration.   (*Id.*).   Plaintiff told Oludare that doing this would break Delaware Department of Correction ("DOC") rules, but Oludare told Plaintiff "to do it," and he arranged "a special call" for Plaintiff to set up the interview.   (*Id.*).

Plaintiff alleges that Oludare was interviewed and returned to work upset after being told there would be no job openings for four to five weeks.   (D.I. 3-1 at 2).   The Complaint alleges that because Oludare was paranoid that Plaintiff would tell someone what had been done, Oludare

---

[1]    Connections is no longer the contract health care provider for the Delaware Department of Correction.   On April 1, 2020, Centurion of Delaware, LLC ("Centurion"), became the contract provider for medical care and behavioral health treatment to individuals under DOC supervision.

orchestrated a write-up to get Plaintiff kicked out of the program.   (*Id*. at 2-3).   After Plaintiff was kicked out of the program on December 6, 2016, he submitted a grievance.   (*Id.* at 3). Plaintiff was interviewed by Mike with Connections Mental Health and, when there was no resolution within 14 days, he submitted another grievance, but received no response.   (*Id*. at 3-4).

Plaintiff alleges he then spoke to DOC employees, wrote a letter to the warden, and the next night he was interviewed by Internal Affairs and was told that Oludare would not work at DOC again.   (*Id*. at 4).   Plaintiff alleges that in December and prior to the termination of his employment, Oludare was told about Plaintiff's grievance and, consequently, others working for Connections at HRYCI also became aware of Plaintiff's grievances.   (*Id.* at 5).   Plaintiff alleges that after that:   (1) his mental health care was neglected; (2) he had strep throat and pneumonia, and went to medical every day for 35 days before he finally received treatment; (3) there were repeated delays in the receipt of eye glasses; (4) he has skin cancer but Connections refuses to provide a biopsy; (5) medical personnel would not draw his blood and made him draw his own blood; (6) his asthma breathing disk is misplaced for four or five days every time he goes to court;[2] and (7) Connections indicated that it was unfair to allow Plaintiff to participate in the program at

---

[2]      In Plaintiff's declaration filed in opposition to Defendant's motion for summary judgment he discusses grievances he submitted complaining of two different times when he was without blood pressure medication, other medical grievances he submitted after he commenced this in June 2017, and improper training of Connections' staff.   (*See* D.I. 92 at 10-11).   These claims were not raised in the Complaint and the Court does not consider them.   *See Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

the HRYCI where he got a counselor fired and recommended that Plaintiff be transferred to SCI.[3] (*Id.* at 5-8).

Following service, the Court entered a scheduling and discovery order, and it was amended several times. On February 12, 2020, Plaintiff filed a request for admissions directed to Defendant. (D.I. 205). The request, however, was filed after expiration of the August 13, 2019 discovery deadline (*see* D.I. 42) and after Defendant filed its motion for summary judgment (*see* D.I. 73). Plaintiff may not seek discovery at this late date, and Defendant has no obligation to respond to the requests.

Defendant moves for summary judgment on the grounds that Plaintiff: (1) failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("the PLRA"); (2) failed to establish an Eighth Amendment claim of deliberate indifference by Connections or its staff; (3) did not attach an affidavit of merit as required for medical negligence claims under Delaware law; and (4) may not collaterally attacked his sentence through this action. (D.I. 74).

Plaintiff opposes and argues that: (1) there remain genuine issues of material facts; (2) his declaration[4] and Defendant's position "are squarely contradictory in regards to eighth amendment claims and retaliation claims"; (3) there is documentation supporting retaliation; and (4) the declaration of Mary Holmes-Brown ("Brown") was submitted in bad faith. (D.I. 91). As to

---

[3]     The prayer for relief seeks a transfer to SCI as well as compensatory damages. Plaintiff informed the Court of his transfer to SCI, effective May 7, 2019. (*See* D.I. 55).

[4]     The Court considers Plaintiff's declaration only to the extent that is refers to facts supported by the record. The Court disregards those portion of the declaration that are argumentative or contain legal conclusions. *See e.g.*, *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) ("[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper . . . to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.").

Brown, Plaintiff filed a motion pursuant to Fed. R. Civ. P. 56(h) seeking sanctions as well as attorney fees and Plaintiff's fees asserting that the declaration was submitted in bad faith. (D.I. 95).   Plaintiff also filed a request for counsel and three motions for injunctive relief. (D.I. 88, D.I. 97, D.I. 100, D.I. 106).

## II.    <u>**FACTS PRESENTED BY THE PARTIES**</u>[5]

**6 for 1 Program and Retaliation**.    Plaintiff was an unsentenced and unclassified inmate until February 2, 2017, when he was sentenced.    (D.I. 7 at 7).    On November 7, 2016, Plaintiff was enrolled in the 6 for 1 substance abuse program.    (D.I. 75-4 at 33; D.I. 75-5 at 2).    Upon enrollment in the 6 for 1 program, Plaintiff acknowledged and signed the Rules and Regulations form that states "[a]ny violation of the following cardinal rules will result in immediate discharge from the program."    (D.I. 75-4 at 17).    Cardinal rules include: "engaging in illegal activities" and "any rule violation committed following the receipt of a Termination Warning from the Assistant Program Manager."    (*Id*.).    Plaintiff also signed and acknowledged the 24/7 standards of the program, which requires appropriate behavior and language and prohibits bartering, stealing, cursing, and name calling.    (*Id*. at 59).

Treatment records indicate that on November 10, 2016, Plaintiff was cooperative in group, and completed the assignment given; on November 19, 2016, he was actively involved in the group discussion, and indicated an understanding in the assignment as evidenced by his detailed answers to the questionnaire; on November 24, 2016, he remained quiet and respectful through the group conversation and indicated an understanding of the group conversation as evidenced by his completed worksheet; on November 25, 2016, Plaintiff met with his counselor to go over goals for his master treatment plan with Plaintiff to begin work on goal #1; and on November 30, 2016,

---

[5]    The facts are construed in favor of Plaintiff, the non-moving party.

Plaintiff shared in the group, and was alert, attentive and respectful.    (D.I. 73 at 34; D.I. 93 at 6, 8, 9).

According to Brown, the 6 for 1 Assistant Director during the relevant time-frame, Plaintiff was frequently argumentative with staff, exhibited attitude and disrespect towards staff and other individuals in the program, did not follow the rules, and made various racial slurs.    (D.I. 75-5 at 3).    On December 5, 2016, Plaintiff received a termination warning for being dishonest and acting covert.    (D.I. 75-4 at 23).    On December 6, 2016, Plaintiff was reported for running a store in the dorm, and removed from the 6 for 1 dorm for covert and dishonest behaviors, a cardinal rule violation of bartering and trading.    (D.I. 75-4 at 29).    Plaintiff was removed from the program when the team determined that Plaintiff would no longer benefit from the program and could cause more harm than good due to his repeated acts of disrespect, resistance to the program, behavior problems, and the fact that he had been there nearly a month without progress.    (D.I. 75-4 at 33; D.I. 75-5 at 2-4).

The discharge report, dated December 9, 2016, states that Plaintiff made minimal progress only completing one assignment from his master treatment plan, however, he did participate in all groups and functions in the program.    (D.I. 93 at 4).    The report provided a "poor" prognosis and noted that Plaintiff was removed for his behavior and "cardinal rule violation" and concluded that Plaintiff would benefit from support group and private counseling.    (D.I. 75-4 at 35; D.I. 75-5 at 3-4; D.I. 93 at 5).    The discharge was marked as behavioral and as a transfer.    (D.I. 75-4 at 33).

Plaintiff claims that he was removed from the program because of the November 28, 2016 incident with Counselor Oludare when Plaintiff arranged for Oludare's job interview at a car dealership where Plaintiff had been employed, and the dealership did not hire Oludare.    (D.I. 51-

1 at 238).   Oludare is no longer employed by Defendant and was escorted from DOC premises upon his termination.   (D.I. 92-1 at 7).

According to Brown, the meeting to remove Plaintiff from the 6 for 1 program took place before any staff member was aware of incident with Counselor Oludare.   (D.I. 75-5 at 4).   Brown states that the then 6 for 1 Program Director was notified about the Oludare incident only after the decision was made to remove Plaintiff from the program.   (*Id*.).   Also according to Brown, Plaintiff would never have been removed from the program because of the incident with Oludare because the incident was not through any fault of Plaintiff.   (*Id.* at 4).

A comprehensive mental health evaluation of Plaintiff was conducted on December 12, 2016.   (D.I. 76 at 32).   At that time, Plaintiff asked to return to the 6 for 1 program.   (*Id.* at 34).   On December 13, 2016, Plaintiff submitted a medical grievance, No. 353718, and complained that he was transferred from the 6 for 1 dorm because of the Oludare incident and that he thought Oludare conspired with Counselor Boone to get him "kicked out." (D.I. 51-1 at 238).   In the grievance Plaintiff states that he was afraid of retaliation at HRYCI and asked for classification to the SCI Key Program.   (D.I. 51-1 at 238).   On December 14, 2016, Plaintiff was assessed for reality testing due to the grievance he submitted and, at that time, again asked to be placed in the 6 for 1 program down state (*i.e.*, SCI) because he did not trust the system at HRYCI and felt like he would be a target because the counselors all work together and talk. (D.I. 76 at 32).

Plaintiff's grievance was investigated.   (D.I. 51-1 at 240).   Plaintiff refused to sign an informal resolution and the matter was heard by the MGC (*i.e.*, medical grievance committee) who denied Plaintiff request for a transfer to the Key Program at SCI, but whose plan was to "consult with security to identify appropriate substance abuse programming" for Plaintiff.   (*Id.* at 248).

Plaintiff had until February 7, 2017 to appeal.   (*Id*.).   A DOC memo dated February 7, 2017, states that Plaintiff signed off on the grievance at the MGC hearing and was awaiting medical's "results of [its] plan on the MGC decision form."   (*Id.* at 252).   In addition, a memo to Plaintiff indicates that Grievance Nos. 353718 and 354843 were resolved at the MGC hearing, the grievances were resolved, thus ending the grievance process and closing the case.   (D.I. 7 at 5). On February 10, 2017, Plaintiff was advised that participation in a drug treatment program occurs upon classification and, on that date, he was not sentenced or classified.   (*Id*. at 6).

**Mental Health**.   Medical records indicate that Plaintiff received mental health treatment on numerous occasions prior to and after his removal from the 6 for 1 program, as follows: June 2, 2016; June 14, 2016; December 12, 2016; December 14, 2016; March 9, 2017; March 24, 2017; November 5, 2017; November 6, 2017; January 18, 2018; January 19, 2018; June 22; 2018; and June 29, 2018.   (D.I. 78 at 6, 7, 17-20, 25, 27, 32, 41, 45).   According to Christopher Moen, M.D. ("Dr. Moen"), former chief medical officer for Connections, Plaintiff was offered an individual course of treatment to address ongoing mental health and/or substance abuse concerns while awaiting entry to the Key Program.[6]   (D.I. 75-1 at 3).   Plaintiff began the individual course of treatment on January 25, 2018 and completed it on May 4, 2018.   (D.I. 76 at 11-17).   Following completion of the program, Plaintiff sought a certificate of completion and was told that it was not the standard of care to issue a certificate.   (*Id.* at 7).   Plaintiff submitted a grievance and complained that he "did not get the certificate [he] was promised after completing therapy to take to [his] judge."   (*Id.* at 6).

---

[6]     The individual therapy treatment consisted of 8 biweekly sessions of psychotherapy and substance abuse counseling.   (D.I. 76 at 17).

According to Dr. Moen, Connections has no authority over housing or inmate classification and does not have authority to prevent an inmate's access to any behavior programs.   (D.I. 75-1 at 3).   Dr. Moen states that Plaintiff is on a waiting list to enter the anger management program, and he is also set to enter the Key Program approximately one year prior to his 2023 scheduled release date.   (*Id*.).

**Skin Lesion/Cancer**.   In 2015 Plaintiff was evaluated at Delaware Valley Dermatology for a head lesion.   (D.I. 77 at 190-199; D.I. 75-1 at 3).   Biopsy results indicated a benign lesion and no further treatment was indicated.   (D.I. 77 at 197-198; D.I. 75-1 at 3).   Plaintiff was advised to schedule a follow-up appointment as needed for steroidal injections or other concerns. (D.I. 77 at 197).   According to Sheri McAfee-Garner ("Garner"), Clinical Services Director at SCI, a skin lesion does not automatically require treatment and only warrants a specialized evaluation or treatment when it presents symptomatic concerns or a significant time has passed since a prior evaluation.   (D.I. 75-2 at 2-4).   According to Dr. Moen, while Plaintiff was housed at HRYCI, his head lesion was monitored by Connections medical staff, there were no changes to the lesion, and treatment was not necessary.   (D.I. 75-1 at 3).

On December 17, 2016, Plaintiff submitted a medical grievance, No. 354690, advising that he had seen a dermatologist in town who told him that he had skin cancer that needed to be removed. [7]   (D.I. 51-1 at 243).   Plaintiff requested a biopsy.   (*Id*. at 245).   Grievance No. 354690 was denied by the MGC on March 17, 2017.   (D.I. 51-1 at 261).   An appeal was due March 24, 2017.   (*Id*.).

---

[7]   On January 11, 2017, Plaintiff refused to sign off on an informal resolution of the grievance.   (*Id*. at 245).

Plaintiff was seen by a nurse practitioner on either December 18 or 19, 2016, who examined the area and indicated that it would be monitored during Plaintiff's chronic care visits.    (*Id.*).    On December 23, 2016, he submitted a second grievance, No. 354642, and complained that the nurse practitioner told him the cancer was not a big deal.    (*Id.* at 246).

During a December 20, 2016 medical visit, Plaintiff voiced concerns over the skin lesion, acknowledged that the lesion was diagnosed as non-malignant but he feared the lesion might turn into cancer and wanted it evaluated.    (D.I. 76 at 31).    (*Id.*).    Plaintiff stated, "I just want it removed."    (*Id.*).    The area was examined and notes indicate that the site would continue to be monitored.    (*Id.*).    Plaintiff had the same concerns when he was seen on March 15, 2017 and June 1, 2017.[8]    (*Id.* at 23, 25).    When Plaintiff was seen on June 1, 2017, he complained of intermittent tenderness and occasional draining at the site and openly admitted to picking at the lesions.    (*Id.* at 23).    The site was examined and the plan was to monitor and reevaluate the area with no need for surgical removal at the time.    (*Id.*).    Medical records make no mention of concerns by Plaintiff regarding the skin lesion when he was seen on August 28, 2017, December 5, 2017, March 6, 2018, May 31, 2018, and September 17, 2018.    (D.I. 76 at 4, 10, 15, 19, 21).

On January 23, 2019, Plaintiff presented to medical with a growth in the scalp, medical contacted the outside dermatologist Plaintiff had seen in the past, and the steps necessary for an outside referral were initiated.    (D.I. 77-5 at 3; D.I. 77 at 155).    On April 8, 2019 medical placed an order for sun screen and a consult for Plaintiff to see a dermatologist.    (D.I. 77-5 at 3-4; D.I. 77 at 154).    Approximately a month after the April 8, 2019 appointment, Plaintiff was transferred from HRYCI to SCI.    (D.I. 77 at 153).    On June 17, 2019, Plaintiff was sent to an outside

---

[8]    Plaintiff filed this lawsuit on June 2, 2017.

dermatologist for an evaluation of the skin lesion on his head and the area was biopsied.   (D.I. 77 at 151-152).   Plaintiff was diagnosed with actinic keratosis, hypertrophic type, described as a non-cancerous benign overproduction of skin cells.   (D.I. 75-2 at 3).   Because actinic keratosis can become cancerous through continuous sun exposure, Plaintiff returned to the outside dermatologist for liquid nitrogen treatment on the skin lesion as a precautionary preventative measure against becoming cancerous.   (*Id*.).   After the nitrogen treatment, Plaintiff again raised concerns that the lesion returned and on October 11, 2019, he returned to the outside dermatologist for another evaluation and a deep biopsy (*Id*.), the preliminary diagnosis being lichen simplex chronicus (chronic itching or rubbing) and perifolliculitis (an accumulation of inflammatory cells around a hair follicle).   (*Id*.).

**Strep Throat and Pneumonia**.   Plaintiff has chronic obstructive pulmonary disease. (D.I. 75-1 at 3).   Respiratory issues are common with this disease.   (*Id*.).   Plaintiff's medical records reflect that he receives treatment for the condition as issues arise.   (D.I. 75-1 at 3; D.I. 76; D.I. 77).

Plaintiff was seen on January 16, 2017 complaining that he thought he had a lung infection. (D.I. 93 at 28).   Assessment indicated clear lungs and noted no nasal congestion or coughing. (*Id*.).   On January 29, 2017, Plaintiff submitted a sick call request complaining of breathing issues.   (D.I. 76 at 160).   Plaintiff was seen at medical on January 31, 2017, and administered an albuterol nebulizer treatment.   (*Id*. at 29).   He submitted another sick call request on February 1, 2017, complaining of breathing difficulty and coughing.   (*Id*. at 161).   When Plaintiff was seen on February 3, 2017, he was given nursing protocol for a sore throat.   (D.I. 76 at 29).   Plaintiff returned to medical on February 5, 2017, again with complaints of difficult breathing.   (*Id*. at 29).   He was administered albuterol nebulizer, he provided a sputum

specimen, and the culture was sent to an outside lab on February 7, 2017.   (*Id.*).   Plaintiff was seen again on February 10, 2017, and administered albuterol nebulizer treatment.   (*Id.*)[9]   The sputum culture tested positive for Beta hemolytic streptococcus, group A (strep throat) and the results were discussed with Plaintiff on February 13, 2017.   (D.I. 75-1 at 3; D.I. 76 at 28).   Plaintiff began treatment for strep throat the same day.   (D.I. 76 at 28).

There is no record evidence that Plaintiff developed pneumonia during the relevant time-frame.[10]   (D.I. 75-1 at 3).   There is no record evidence that Plaintiff submitted grievances complaining of delay in treatment or failure to treat strep throat or pneumonia during the relevant time-frame.   On June 10, 2018, Plaintiff submitted a grievance, No. 407210, complaining of a cough for 35 days and asking for a culture for strep.   (D.I. 93 at 33, 34).

**Glasses**.   On October 28, 2016, Plaintiff submitted a sick call request for prescription glasses.   (D.I. 93 at 38).   On November 27, 2016, Plaintiff submitted a grievance, No. 352818, complaining that it had been four weeks since he signed a release and he needed glasses.   (*Id.* at 40).   Plaintiff was told that his prescription had been received, but it had expired and that Plaintiff had been added to the list for an optometry consult.   (*Id.*).   A consult request was issued on December 13, 2016, and Plaintiff was seen by an optometrist on January 17, 2017.   (*Id.* at 42-46).   Single vision lenses were ordered for Plaintiff.   (*Id.* at 45).

On February 13, 2017, Plaintiff submitted a sick call slip grievance complaining that he received someone else's glasses because he could not see out of them.   (D.I. 76 at 198, 258).

---

[9]     Plaintiff was not seen on February 7, 2017 due to a facility lockdown and did not receive his morning medication on February 12, 2017, due to another lockdown.   (D.I. 76 at 29).

[10]     Plaintiff refers to difficulty breathing and refers to medical records showing medical visits during May and June 2018.   (*See* D.I. 92 at 7).   Plaintiff commenced this action in June 2017.   This evidence is not related in time to the claims raised in the Complaint.

Plaintiff was seen at sick call on February 17, 2017, and rescheduled to see optometry.   (*Id.* at 28, 259).   Plaintiff saw optometry in March 2017 and new glasses were ordered.   (*Id*. at 269).   On April 11, 2017, Plaintiff submitted another grievance about the glasses and was told the glasses had been ordered and it usually takes about six weeks for them to come in.   (*Id*.).   The grievance was resolved through the administrative process.   (*Id*.).   Plaintiff received his new glasses on May 23, 2017, solar shields for his glasses on May 24, 2017, and a replacement pair of glasses on July 28, 2017.   (*Id*. at 203, 205, 207).

**Blood Draw**.   According to Plaintiff, a nurse who was having difficulty drawing Plaintiff's blood, pulled the butterfly needle out, handed it to Plaintiff, and told him to hit the vein himself.   (D.I. 92 at 9).   Plaintiff, a recovering IV drug user, "proceeded to hit the vein," and blood was drawn.   (*Id*.).   On March 22, 2017, Plaintiff submitted a medical grievance over the incident.   (D.I. 76 at 265).   It appears that the grievance was deemed not a "medical issue." (*Id*.).   During a sick call visit on March 24, 2017, Plaintiff discussed the issue and complained that he was concerned that he was not receiving adequate care.   (D.I. 93 at 61-62).

According to Victor A. Heresniak, D.O. ("Dr. Heresniak"), Connections chief medical officer, the blood draw incident was not a breach of the standard of care and there is no evidence Plaintiff suffered any physical or medical harm as a result of the draw.   (D.I. 104 at 2).   Also according to Dr. Heresniak, this was an isolated incident and did not constitute a policy, standard, or custom of Connections.   (*Id*. at 3).

**Nebulizer Breathing Treatments**.   According to Dr. Moen, Plaintiff is provided inhalers as keep-on-person medication to use as needed.   (D.I. 75-1 at 4).   Plaintiff is responsible for the keep-on-person medication and requesting refills when the medication is low.   (*Id*.).   Also according to Dr. Moen, Plaintiff receives nebulizer treatment when medically necessary.   (*Id*.).

Dr. Moen explains that a normal pulse oximeter reading ranges from 95%-100% and absent significant symptoms of respiratory distress, a nebulizer treatment is not medically necessary for a pulse oximeter reading of 95% or higher.   (*Id*.).

On February 22, 2017, Plaintiff submitted a grievance, No. 358123, that he was denied his breathing treatment due to fallout from Oludare's firing.   (D.I. 76 at 260).   Plaintiff asked for a transfer to SCI and breathing treatments.[11]   (*Id*.).   Plaintiff was seen by medical that day, and records indicate that his oxygen reading was 98%, he did not exhibit any signs of respiratory distress, his lungs were clear in all fields, and he was escorted back to his housing unit.   (*Id*. at 27-28).   Plaintiff submitted a second grievance, No. 360229, on March 19, 2017, complaining that he was without his Advair inhaler and that when he tried to get a nebulizer treatment he was told it was not needed.   (D.I. 51-1 at 262).   Plaintiff asked to be moved for his safety.   (*Id*.). It appears that Grievance No. 360229 was resolved with Grievance No. 358123.   (*Id*.).   On May 12, 2017, Plaintiff submitted a third grievance, No. 368251, and complained that he was told his ProAir and nebulizer were cancelled.   (*Id*. at 276).   It appears that on the same day, the grievance was resolved and it was noted that ProAir and Advair were given to Plaintiff to keep-on-person and that albuterol was prescribed.   (*Id*.).

## III.   **RULE 56(h) MOTION**

Plaintiff contends that Brown's declaration was submitted in bad faith and seeks sanctions as well as attorneys' fee and his fees.   (D.I. 95).   Plaintiff argues that the statements in Brown's declaration are not supported by his mental health records and there is no support for her statement

---

[11]   There was an informal resolution on March 31, 2017 that indicated Plaintiff's received Advair keep-on-person on March 21, 2017, and that noted Plaintiff had ProAir and albuterol available during the relevant time.   (D.I. 51-1 at 260).   Plaintiff signed off on the grievance.   (*Id*.).

that Plaintiff used racial slurs.   He contends that the declaration is "really just a bad shot at finding something negative to say about [him]."   (*Id.*).   Defendant opposes the motion and rebuts each statement to which Plaintiff takes exception.   (D.I 103).   In sum, Defendant states that Brown's declaration was not submitted in bad faith and it explained the circumstances that resulted in Plaintiff's removal from the 6 for 1 program.

The Court has considered Plaintiff's position and the rebuttal presented by Defendant.   In doing so, it is not satisfied that Brown's declaration was submitted in bad faith.   Therefore, the motion will be denied.   (D.I. 95).

## IV.   **SUMMARY JUDGMENT LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.   *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).   A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party, and a factual dispute is material when it "might affect the outcome of the suit under the governing law."   *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986).

The nonmoving party bears the burden to establish the existence of each element of his case.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   In doing so, the non-moving party must present specific evidence from which a reasonable fact finder could conclude in his favor. *Anderson*, 477 U.S. at 248; *Jones v. United Parcel Serv*., 214 F.3d 402, 407 (3d Cir. 2000).

Summary judgment should be granted if no reasonable trier of fact could find for the non-moving party.   *Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir. 1989).

## V.   **DISCUSSION**

### A.   **Administrative Remedies**

Defendant seeks summary judgment on the grounds that Plaintiff has failed to demonstrate that he has exhausted his administrative remedies for the claims at issue.   Plaintiff opposes summary judgment on this ground and refers to numerous grievances he submitted.   He contends that he submitted many grievances many of which were never received or answered and none that resulted in his satisfaction.   Plaintiff argues that HRYCI has an ineffective grievance process. Plaintiff did not address the grievance process as to each issue he raised.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").   The PLRA requires only "proper exhaustion," meaning exhaustion of those administrative remedies that are "available."   *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).

Failure to exhaust administrative remedies must be pled and proved by the defendant.   *Ray v. Kertes*, 285 F.3d   287, 295 (3d Cir. 2002).   Defendant bears the burden of proof on exhaustion as it is an affirmative defense.   *See Sears v. McCoy*, __F. App'x__, 2020 WL 3830921 (3d Cir. July 8, 2020) (citing *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002) (district court erred in granting summary judgment when defendant did not meet burden of proving that plaintiff inmate

had not exhausted his administrative remedies).   Defendant argues that summary judgment is appropriate by reason of Plaintiff's failure to exhaust because he did not provide evidence that he exhausted his administrative remedies, but as just discussed, the burden is on Defendant, not Plaintiff, to prove the failure to exhaust.

Exhaustion applies only when administrative remedies are "available."   *See Ross v. Blake*, __U.S.__, 136 S. Ct. 1850 (2016).   Administrative remedies are not available when the procedure "operates as a simple dead end--with officers unable or consistently unwilling to provide any relief to aggrieved inmates," where it is "so opaque that it becomes, practically speaking, incapable of use," or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[12]   *Id.* at 1859-60.   "Just as inmates must properly exhaust administrative remedies per the prison's grievance procedures, prison officials must strictly comply with their own policies."   *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Shifflett v. Korszniak*, 934 F.3d 356, 367 (3d Cir. 2019) ("[W]e hold that [the PLRA] requires strict compliance by prison officials with their own policies.").   "But '[w]hen an administrative process is susceptible [to] multiple reasonable interpretations, . . . the inmate should err on the side of exhaustion.'"   *Id*. (quoting *Ross*, 136 S. Ct. at 1859).

---

[12]   Although a prisoner must exhaust "available" administrative remedies to sue in court, administrative remedies are "unavailable" when prison officials "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."   *Rinaldi v. United States*, 904 F.3d 257, 266-67 (3d Cir. 2018).   To show a prison official's threats thwarted inmates from the grievance process, the plaintiff must show "(1) that the [prison official's] threat was sufficiently serious that it would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance and (2) that the threat actually did deter this particular inmate."   *Id*. at 268.

"If exhaustion is not complete at the time of filing, dismissal is mandatory." *See Victor v. Lawler*, 565 F. App'x 126, 129 (3d Cir. 2014); *see also Wallace v. Miller*, 544 F. App'x 40, 42 (3d Cir. 2013) ("Any efforts that [plaintiff] has made to exhaust his administrative remedies after August 15, 2011, the date he filed his complaint, are not relevant."); *Nifas v. Beard*, 374 F. App'x 241, 245 (3d Cir. 2010) ("[B]ecause exhaustion was not completed by the commencement date of the lawsuit, the Magistrate Judge properly granted summary judgment and dismissed the . . . claims for failure to comply with 42 U.S.C. § 1997e(a)."); *Banks v. Roberts*, 251 F. App'x 774, 776 (3d Cir. 2007) ("A prisoner may not satisfy the PLRA's exhaustion requirement by exhausting administrative remedies after initiating suit in federal court."); *Oriakhi v. United States*, 165 F. App'x 991, 993 (3d Cir. 2006) (per curiam) ("Indeed, there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court.").

During the relevant time-frame medical grievances were processed as follows:

> For medical grievances, offenders may not submit a grievance before attempting to use the sick call request process. An offender manually completes a form # 585 "medical grievance" within seven calendar days of the incident (*i.e.*, after the sick call appointment), and it is forwarded to the IGC for electronic entry. Upon receipt of a medical grievance, the IGC forwards the grievance to the health services administrator ("HAS") for review. First, the site HSA or designee reviews grievances on a weekly basis and attempts to resolve concerns brought by offenders at the initial stage of the formal grievance process after review of the record, interviews, and investigation for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the medical grievance committee ("MGC") for review and it makes a determination to uphold or deny the grievance; and third, if an offender appeals, the grievance is reviewed by the BGO (who is a member of Bureau of Correctional Healthcare Services), and the BGO makes a recommendation to the bureau chief or his or her designee who then accepts or rejects the BGO's recommendation in deciding the disposition of the case.

*Wood v. Russell*, 255 F. Supp. 3d 498, 508 (D. Del. 2017) (internal citations omitted) (citing http://www.doc.delaware.govIdownloads/policies/policy_11-A-11.pdf (last visited May 30, 2017), DOC Policy No. A–11 ¶¶ Vl.E.–G (effective date 11/7/04, revised 4/13/09; 7/16/2010; 1/24/2011; 3/22/2013; 7/30/2013; 9/2/2015)).[13]

Defendant contends that although the record demonstrates Plaintiff submitted grievances concerning alleged skin cancer, there is no evidence that Plaintiff appealed any of those grievance and, therefore, the claim has not been administratively exhausted.   The record reflects that on December 17, 2016, Plaintiff submitted a medical grievance, No. 354690, advising that he had seen a dermatologist in town who told him that he had skin cancer that needed to be removed, that Grievance No. 354690 was denied by the MGC on March 17, 2017, and that the appeal was due March 24, 2017.   Plaintiff submitted a second grievance, No. 354642, on December 23, 2016, and complained that the nurse practitioner told Plaintiff that his cancer was not a big deal.  As Defendant correctly notes, there is no evidence that Plaintiff appealed grievance No. 354690 and there is no evidence that Plaintiff exhausted Grievance No. 35462.   (*Id.*).   Because there was no appeal, Plaintiff failed to exhaust his administrative remedies as to this claim.[14]

Defendant argues that there is no record that Plaintiff submitted any grievances regarding strep throat or pneumonia.   Defendant is correct.   Plaintiff did submit Grievance No. 407210 on

---

[13]   The current medical grievance policy DOC Policy A-10, became effective May 14, 2019, and was amended June 19, 2020.   When Policy A-10 became effective on May 14, 2019, the policy stated that the process had changed significantly.   *See Smith v. Brackett*, 2020 WL 3035578, at 2 (D. Del. June 5, 2020);   *See also* https://doc.delaware.gov/assets/documents/policies/policy_11-A-10.pdf   (last visited Aug. 31, 2020).

[14]   Even had Plaintiff exhausted his skin lesion/cancer claim, no reasonable jury could find for him on this issue.   It is clear from the medical record that Plaintiff's condition was continually monitored and treatment provided.

June 10, 2018 complaining of a cough for 35 days and asking for a culture for strep, however, the grievance was submitted approximately one year after Plaintiff commenced this action.   Clearly, the claims were not exhausted prior to the Complaint's filing as is required under the PLRA.[15]

Defendant argues that Plaintiff did not exhaust grievances he submitted that complained of the delay in receiving eyeglasses and the blood draw procedure.   The Court finds Plaintiff exhausted his administrative remedies for these claims.   The glasses issue was resolved at the administrative level, and hence it was not necessary to take further steps.   As to the blood draw issue, it appears from the record that the blood draw grievance was rejected as "non medical" leaving Plaintiff without a grievance remedy.

Defendant met its burden to show that Plaintiff failed to exhaust his administrative remedies on the skin lesion/cancer claims and the strep throat/pneumonia claims:   Therefore, the Court will grant in part Defendant's motion for summary judgment for failure to exhaust as to those claims.

### B.    Retaliation

Defendant's supporting brief contains a detailed statement of facts relative to Plaintiff's claim that Defendant retaliated against him for the actions of Oludare who was terminated following an incident with Plaintiff and that Connections was then deliberately indifferent to Plaintiff's mental health needs, again in retaliation.   Defendant's brief in support of summary judgment does not contain a separate section that addresses the retaliation issue.   Defendant seems to subsume this issue into the Eighth Amendment claim discussed below.   In its reply brief,

---

[15]    Like the skin lesion/cancer claim, the record reflects that Plaintiff received medical treatment for strep throat.   Moreover, other than Plaintiff's assertion that he knows what it feels like when he has pneumonia, the medical records do not reflect that Plaintiff was diagnosed as having pneumonia.

however, Defendant argues that Plaintiff failed to produce any evidence that the Oludare grievance had any impact on Plaintiff's medical care or that Plaintiff suffered any adverse action by prison officials motivated by the grievance.   (D.I. 103 at 11).

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983."   *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990).   In order to establish a retaliation claim Plaintiff must show that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected activity was a substantial or motivating factor in the decision to discipline him.   *See Watson v. Rozum*, 834 F.3d 417, 420 (3d Cir. 2016).

The causation element requires a plaintiff to prove either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.   *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997).   "[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."   *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).   When analyzing a retaliation claim, courts consider that the task of prison administrators and staff is difficult, and that the decisions of prison officials require deference, particularly where prison security is concerned.   *Rauser*, 241 F.3d at 334.

Plaintiff has met two elements of a retaliation claim.   His submissions of grievances regarding the Oludare incident were protected activity and he suffered an adverse action when he was removed from the 6 for 1 program.   The record, however, does not support a finding that

Plaintiff's constitutionally protected activity was a substantial or motivating factor in the decision to remove him from the 6 for 1 program.    The record evidence is that Plaintiff was removed from the program for several reasons including the receipt of a terminating warning on December 5, 2015 for being dishonest and acting covert, followed by removal from the 6 for 1 dorm on December 6, 2105 for running a store in the dorm in violation of the 6 for 1 cardinal rules. Notably, the warning and the removal both occurred approximately one week prior to the time that Plaintiff submitted the Oludare grievance that he was afraid retaliation might occur at HRYCI as a result of the Oludare incident.    The time-line makes it impossible for Defendant to have retaliated against Plaintiff as a result of the grievance.    Moreover, the unrefuted evidence is that the 6 for 1 program director was notified about the Oludare incident only after the decision was made to remove Plaintiff from the program, again making it impossible for Defendant to have retaliated against Plaintiff due to the Oludare occurrence.    Although Plaintiff contends that Oludare conspired with others, including an inmate, to have Plaintiff removed from the 6 for 1 program and that Plaintiff was removed from the program due to unverifiable claims of another inmate, he provides no evidence to support his position.    Notably, Plaintiff's grievance states that he "thought" Oludare conspired to have Plaintiff removed from the program because Oludare was paranoid someone would find out that Plaintiff had arranged for Oludare's interview.

Finally, the record evidence does not support Plaintiff's claim that Defendant retaliated against him by refusing to provide mental health services.    To the contrary, the record is replete with notes referring to Plaintiff's mental health treatment.    Following Plaintiff's removal from the 6 for 1 program he was seen by mental health on March 9, 2017; March 24, 2017; November 5, 2017; November 6, 2017; January 18, 2018; January 19, 2018; June 22; 2018; and

June 29, 2018.   In addition, Plaintiff was offered an individual course of treatment to address mental health and/or substance abuse concerns while waiting to enter the Key Program.

No reasonable jury could find for Plaintiff on the retaliation claim.   The Court, therefore, will grant Defendant's motion for summary judgment on this claim.

### C.      Eighth Amendment Claims

Defendant seeks summary judgment on the Eighth Amendment claims on the grounds that Plaintiff received continuing courses of treatment, his dispute is over the adequacy of care, his claims of inadequate medical care in the form of delayed or denied treatment are mischaracterized and inaccurate, and he has failed to establish that Connections maintained a policy, practice or custom that caused him constitutional harm.

Conversely, Plaintiff contends that there were gaps in medical care and delay in treatment of pain and anxiety producing conditions.   Plaintiff particularly refers to pain as a result of the skin lesions.   As discussed above, Plaintiff did not fully exhaust this claim and it this argument is not considered.   At issue is whether Connections violated the Eighth Amendment on three of Plaintiff's claims:   delay in receiving eyeglasses; blood draw incident; and delay or denial of breathing medication or treatments, these claims having been administratively exhausted.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.   *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).   In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).   A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm.   *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

There is a distinction between claims that treatment was delayed or denied and claims that treatment occurred but was inadequate. *Pearson*, 850 F.3d at 535. The Eighth Amendment's proscription against cruel and unusual punishment mandates that incarcerated offenders receive adequate medical care. "[A] prisoner [however] has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x. 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). In addition, there is a presumption that treatment is proper, absent evidence that there was a violation in the standard of care. *Pearson*, 850 F.3d at 535.

Also, an inmate's claims against members of a prison medical department are not viable under §1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle*, 429 U.S. at 107. Moreover, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *White v. Napoleon*, 897 F.2d at 108-09 (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05. Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry – because there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim. *Pearson*, 850 F.3d

at 537.   Absent that objective inquiry, extrinsic proof is not necessary for the jury to find deliberate indifference in a delay or denial of medical treatment claim.   *Id*.   All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors.   *Id*.   (citing *Durmer v. O'Carroll*, 991 F.2d 64, 68-69 (3d Cir. 1993).

Finally, when a plaintiff relies upon a theory of respondeat superior to hold a corporation such as Connections liable, he must allege a policy or custom that demonstrates such deliberate indifference.   *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992).   To establish that Connections is directly liable for the alleged constitutional violations, Plaintiff "must provide evidence that there was a relevant [Connections] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]."   *Natale v. Camden Cty. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories).   Assuming the acts of Defendant's employee have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need.   *See Natale*, 318 F.3d at 584 (citations omitted).   "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'"   *Miller v. Corr. Med. Sys., Inc.*, 802 F. Supp. at 1132 (alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).   "Custom, on the other hand, can be

24

proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)).

As to Plaintiff's claim of repeated delays in providing him eyeglasses, although a delay occurred, there is no record evidence that the delay was motivated by non-medical factors.   Some delay occurred when it was discovered that Plaintiff's prescription from his outside provider had expired, requiring another optometry visit.   More delay occurred when the first pair of glasses were ordered as single lenses and not bifocal lenses as Plaintiff required and had to be reordered. The new pair of glasses ordered took about six weeks to receive, something beyond the control of Defendant.   At most the ordering error was negligence, something akin to human error.   Finally, the evidence indicates that Defendant took appropriate steps to provide Plaintiff the glasses he required.   Although there may have been a delay, the record does not support a finding that the delay was due to deliberate indifference.

Plaintiff also alleges deliberate indifference because his asthma breathing disk (*i.e.*, Advair inhaler) was lost, or not ordered at all, sometimes up to five days at a time.[16]   The record reflects that Plaintiff receives nebulizer treatments when medically necessary.   It also reflects that Connections responded to Plaintiff's complaints, albeit not as quickly as he would have liked. Plaintiff is provided medication to keep on person and he had breathing medication during the relevant time-frame.   Moreover, there is no record evidence that any delay in providing Plaintiff's lost breathing medication was motivated by non-medical factors.   Similar to the eyeglasses issues,

---

[16]   The Court only considers Plaintiff's claim for breathing medication/treatments.   As previously noted, Plaintiff did not raise a claim regarding delay/denial of other medication in his Complaint.   *See* n.2, *supra*.

the record does not support a finding that Defendant was deliberately indifferent in providing Plaintiff the medication required for his chronic obstructive pulmonary disease.

Finally, Plaintiff alleges deliberate indifference when medical personnel had Plaintiff assist in drawing his own blood.   The undisputed record evidence is that the event was an isolated incident, was not a breach of the standard of care, and was not a policy, standard, or custom of Defendant.   Moreover, there is no evidence Plaintiff was harmed as a result of the incident.

Next, the Court turns to the issue of whether Defendant had a policy, practice, or custom that demonstrated deliberate indifference to Plaintiff's serious medical needs.   The record simply does not support this claim.   To the contrary, the record evidence is that Plaintiff has been consistently provided care and treatment for his medical conditions.   Given that Plaintiff failed to produce evidence of an Eighth Amendment violation or that a violation was caused by Connections' policy or custom, summary judgment is proper on its behalf.   *See Palakovic v. Wetzel,* 854 F.3d 209, 232 (3d Cir. 2017) ("To state a claim against a private corporation providing medical services under contract with a state prison system, a plaintiff must allege a policy or custom that resulted in the alleged constitutional violations at issue.") (citing *Natale*, 318 F.3d at 584); *see also Fields v. Delaware Dep't of Corr.*, 787 F. App'x 796, 799 (3d Cir. 2019) (summary judgment proper for corporate medical provider where there is no evidence of an Eighth Amendment violation, let alone a violation caused by medical provider's policy or custom).

In light of the foregoing, no reasonable jury could find in favor of Plaintiff on his Eighth Amendment claims of deliberate indifference to serious medical needs.   Therefore, the Court will grant Defendant's motion for summary judgment on the issue.

### D.    Medical Negligence

Defendant moves to dismiss state negligence claims to the extent they are raised by Plaintiff.    In Delaware, medical malpractice is governed by the Delaware Health Care Negligence Insurance and Litigation Act.    *See* 18 Del. C. §§ 6801-6865.    When a party alleges medical negligence, Delaware law requires the party to produce an affidavit of merit with expert medical testimony detailing: (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury.    *Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 804 (D. Del. 2003) (quoting *Green v. Weiner*, 766 A.2d 492, 494-95 (Del. 2001)) (internal quotations omitted); 18 Del. C. § 6853.    To the extent Plaintiff alleges medical negligence, at the time he filed his Complaint he was required to submit an affidavit of merit as to each defendant signed by an expert witness.    18 Del. C. § 6853(a)(1).    He did not.    Therefore, the Court will grant the motion to dismiss the medical negligence claims.

### E.    Collateral Attack

Defendant moves to dismiss Plaintiff's claims that he would have received a more favorable sentence had he successfully completed the 6 for 1 program.    The Court does not construe Plaintiff's Complaint as raising such a claim.    Regardless, to the extent that Plaintiff attempts to challenge his conviction and/or sentence, his sole federal remedy for challenging the fact or duration of his confinement is by way of habeas corpus.    *Preiser v. Rodriguez*, 411 U.S. 475 (1973); *see also Torrence v. Thompson*, 435 F. App'x 56 (3d Cir. 2011).    In addition, Plaintiff cannot recover under § 1983 for alleged wrongful incarceration unless he proves that his conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.    *See Heck v. Humphrey*, 512 U.S. 477, 487

(1994).   The record contains no such evidence.   Therefore, the Court will grant Defendant's motion to dismiss this claim.

## VI.   **MOTIONS FOR INJUNCTIVE RELIEF**

Plaintiff has filed three motions for injunctive relief.   The first asks the Court to contact the DOC due to conflicts with Connections counselors as a result of the Oludare incident. (D.I. 97, 99).   The second, asks the Court to remove Plaintiff from the SCI Key Program because Plaintiff fears retaliation by Connections' staff.   (D.I. 100).   And the third, dated March 2, 2020, complains that Connections' employees would not allow access to the restroom during group sessions, indicates that DOC personnel changed the policy, and asks the Court to intervene to protect Plaintiff's rights.   (D.I. 106).   Plaintiff complains of continuing retaliation by Connections.

Connections is no longer the healthcare provider for the DOC, having been replaced by Centurion on April 1, 2020.   Because Connections is no longer the contract healthcare provider for the DOC, Plaintiff's motions for injunctive relief are moot as he is unlikely to suffer any more alleged harm from Connections or its personnel.   *See Jones v. Unknown D.O.C. Bus Driver & Transportation Crew,* 944 F.3d 478, 483 (3d Cir. 2019) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983) and *O'Shea v. Littleton*, 414 U.S. 488, 502.   Accordingly, the motions will be denied as moot.   (D.I. 97, 100, 106).

## VII.   **CONCLUSION**

For the above reasons, the Court will:   (1) grant Defendant's motion for summary judgment (D.I. 73); (2) deny Plaintiff's motion for Rule 56(h) declaration submitted in bad faith

28

(D.I. 95); (3) deny Plaintiff's request for counsel (D.I. 88)[17]; and (4) deny as moot Plaintiff's motions for injunctive relief (D.I. D.I. 97, D.I. 100, D.I. 106).

An appropriate order will be entered.

---

[17] Plaintiff seeks counsel on the grounds that he is indigent, has no legal skills, is 51 years old, and incarcerated.   The request will be denied.   Plaintiff, as a *pro se* litigant proceeding *in forma pauperis*, has no constitutional or statutory right to representation by counsel.   *See Brightwell v. Lehman*, 637 F.3d 187, 192 (3d Cir. 2011); *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993).   Although representation by counsel may be appropriate under certain circumstances, the Court finds that counsel is not warranted in this case.   The issues are not complex.   Notably, Plaintiff has ably represented himself throughout this litigation.   He has responded appropriately to all motions, engaged in discovery, and applied the law and facts to his case.